John NOVOSEL, Appellant,

v.

NATIONWIDE INSURANCE COMPANY.

No. 83–5101.

United States Court of Appeals, Third Circuit.

Argued Sept. 14, 1983.

Decided Oct. 26, 1983.

As Amended Nov. 2, 1983.

Rehearing and Rehearing In Banc Denied Nov. 28, 1983.

Amended Order of Denial of Rehearing and Rehearing In Banc Filed Dec. 19, 1983.

James H. Logan (argued), Pittsburgh, Pa., Darrell L. Kandunce, Butler, Pa., for appellant.

Charles W. Kenrick (argued), Richard C. Polley, Dickie, McCamey & Chilcote, Pittsburgh, Pa., for appellee.

Before ADAMS, HUNTER and GARTH, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

This appeal presents us with the task of determining under what circumstances a federal court sitting in diversity under Pennsylvania law may intercede in a non-union employment relationship and limit the employer's ability to discharge employees. In his suit against Nationwide Insurance Company, John Novosel brought two separate claims, one sounding in tort, the other in contract. The tort claim turns on whether a cause of action is created by a discharge that contravenes either important public policies or rights conferred on employees as members of the citizenry at large. The contract claim raises the question whether an enforceable contractual right to longterm employment may be read into what has traditionally been termed an employment-at-will position. The district court, concluding that no cause of action was stated, granted the employer's motion to dismiss both claims. Finding jurisdiction over this appeal under 28 U.S.C. § 1291, we

vacate the district court's judgment and remand for further proceedings.

## I

Novosel was an employee of Nationwide from December 1966 until November 18, 1981.[1] He had steadily advanced through the company's ranks in a career unmarred by reprimands or disciplinary action. At the time his employment was terminated, he was a district claims manager and one of three candidates for the position of division claims manager.

In late October 1981, a memorandum was circulated through Nationwide's offices soliciting the participation of all employees in an effort to lobby the Pennsylvania House of Representatives. Specifically, employees were instructed to clip, copy, and obtain signatures on coupons bearing the insignia of the Pennsylvania Committee for No-Fault Reform. This Committee was actively supporting the passage of House Bill 1285, the "No-Fault Reform Act," then before the state legislature.

The allegations of the complaint charge that the sole reason for Novosel's discharge was his refusal to participate in the lobbying effort and his privately stated opposition to the company's political stand. Novosel contends that the discharge for refusing to lobby the state legislature on the employer's behalf constituted the tort of wrongful discharge on the grounds it was willful, arbitrary, malicious and in bad faith, and that it was contrary to public policy. Alternatively, the complaint avers a breach of an implied contract promising continued long-term employment so long as Novosel's job performance remained satisfactory. Novosel sought damages, reinstatement and declaratory relief. Nationwide did not file an answer to the complaint; instead it presented a motion to dismiss. Following the submission of briefs on the motion to dismiss, and without benefit of either affidavits or oral argument, the district court granted the motion on January 14, 1983.

## II

Considerable ferment surrounds the doctrine of employment-at-will.[2] Once the common-law cornerstone of employment relations not covered by either civil service laws or the National Labor Relations Act, the at-will doctrine has been significantly eroded by both tort and contract theories similar to those propounded by appellant in this case.[3] Already 29 states have granted some form of common law exceptions to the at-will doctrine; in addition, the courts of five other states as well as the District of Columbia have indicated their willingness to do so.[4]

█ While cognizant of these developments, we are also mindful of the limita-

1. While some factual disputes are evident from the briefs, this appeal is taken from a dismissal under Rule 12(b)(6) of the Fed.R.Civ.Pro. Therefore, all appellant's allegations must be taken as true and must be viewed in the light most favorable to appellant. *Paolino v. Channel Home Centers,* 668 F.2d 721, 722 (3d Cir. 1981); 2A *Moore's Federal Practice,* ¶ 12.08 (1983).

2. An oft quoted statement of this doctrine is found in *Payne v. Western & Atl. R.R. Co.,* 81 Tenn. 507, 518–19 (1884), *overruled on other grounds, Hutton v. Watters,* 132 Tenn. 527, 544, 179 S.W. 134, 138 (1915):

    [M]en must be left, without interference to buy and sell where they please, and to discharge or retain employees at will for good cause or for no cause, or even for bad cause without thereby being guilty of an unlawful act per se. It is a right which an employee may exercise in the same way, to the same extent, for the same cause or want of cause as the employer.

3. *See* Summers, Introduction: Individual Rights in the Workplace: The Employment-At-Will Issue, 16 J.L. Law Reform 201, 203 (1983); Lubin, *Legal Challenges Force Firms to Revamp Ways They Dismiss Workers,* Wall St.J., Sept. 13, 1983 at 1, col. 6.

4. *See Wiskotoni v. Mich. Nat'l Bank-West,* 716 F.2d 378 (6th Cir.1983) (allowing tort and contract claims under Michigan state law). For a compilation of the case law, see DeGiuseppe, The Effect of the Employment-at-Will Rule on Employee Rights to Job Security and Fringe Benefits, 10 Fordham Urb.L.J. 1, 23 n. 101 (1981); Note, Reforming At-Will Employment Law: A Model Statute, 16 J.L. Reform 389, 394 n. 29 (1983).

tions placed upon a federal court sitting in diversity. As this Court has ruled, we are "not free to follow our own inclinations as to the manner in which the common law should develop...." *Bruffett v. Warner Communications, Inc.,* 692 F.2d 910, 918 (3d Cir.1982). Thus, we are confined to the developments of the Pennsylvania common law that govern this case. At the same time, however, "a federal court must be sensitive to the doctrinal trends of the state whose law it applies, and the policies which inform the prior adjudication by the state courts." *Becker v. Interstate Properties,* 569 F.2d 1203, 1206 (3d Cir.1977). Difficulties arise where

> the highest state court has not yet authoritatively addressed the critical issue. Recent opinions of this Court make clear that our disposition of such cases must be governed by a prediction of how the state's highest court would decide were it confronted with the problem. Although some have characterized this assignment as speculative or crystal-ball gazing, nonetheless it is a task which we may not decline.

*McKenna v. Ortho Pharmaceutical Corp.,* 622 F.2d 657, 661–62 (3d Cir.1980) (footnote omitted).

The issue before us, then, is to determine whether the tort and contract claims proffered by the plaintiff state a sufficient cause of action under applicable Pennsylvania state law to survive a motion to dismiss.

### III

Novosel's tort allegations raise two separate issues: first, whether a wrongful discharge claim is cognizable under Pennsylvania law; second, if such a claim can go forward under state law, by what standard is a court to determine whether the facts set forth in the complaint present a sufficient basis for a successful tort action.

### A

The circumstances of the discharge presented by Novosel fall squarely within the range of activity embraced by the emerging tort case law.[5] As one commentator has written:

> The factual pattern alleged in these cases seldom varies. The employee objects to work that the employee believes is violative of state or federal law or otherwise improper; the employee protests to his employer that the work should not be performed; the employee expresses his intention not to assist the employer in the furtherance of such work and/or engages in "self-help" activity outside the work place to halt the work; and the employer discharges the employee for refusal to work or incompatibility with management.

Olsen, *Wrongful Discharge Claims Raised By At Will Employees: A New Legal Concern for Employers,* 32 Lab.L.J. 265, 276 (1981). In a landmark opinion, the Pennsylvania Supreme Court acknowledged that such a situation could give rise to a legal cause of action:

> It may be granted that there are areas of an employee's life in which his employer has no legitimate interest. An intrusion into one of these areas by virtue of the employer's power of discharge might plausibly give rise to a cause of action, particularly where some recognized facet of public policy is threatened. The notion that substantive due process elevates an employer's privilege of hiring and discharging his employees to an absolute constitutional right has long since been discredited.

*Geary v. United States Steel Corp.,* 456 Pa. 171, 184, 319 A.2d 174, 180 (1974). Under the particular facts of *Geary,* the court held:

> this case does not require us to define in comprehensive fashion the perimeters of this privilege [to employ-at-will], and we

**5.** For the judicial origins of the tort of wrongful discharge see *Petermann v. Int'l Bro. of Teamsters,* 174 Cal.App.2d 184, 189, 344 P.2d 25, 27 (1959) (discharge for refusal to commit perjury "patently contrary to the public welfare");

*Monge v. Beebe Rubber Co.,* 114 N.H. 130, 132, 316 A.2d 549, 551 (1974) (female employee wrongfully discharged for refusing to date foreman; court rejected employment-at-will defense as "based on ancient feudal system").

decline to do so. We hold only that where the complaint itself discloses a plausible and legitimate reason for terminating an at-will employment relationship and no clear mandate of public policy is violated thereby, an employee at will has no right of action against his employer for wrongful discharge.

456 Pa. at 184–85, 319 A.2d at 180. Despite the actual holding, *Geary* stands for the availability of legal remedies in private employer wrongful discharge cases and has been so interpreted by this Court. *Bruffett, supra,* 692 F.2d at 917–18; *Perks v. Firestone Tire & Rubber Co.,* 611 F.2d 1363, 1365 (3d Cir.1979); Murg & Scharman, *Employment At Will: Do the Exceptions Overwhelm the Rule?,* 23 B.C.L.Rev. 329, 345 n. 101 (1982).

Two subsequent Pennsylvania Superior Court cases upheld wrongful discharge causes of action under the theory that "where a clear mandate of public policy is violated by the [employee's] termination, the employer's right to discharge may be circumscribed ..." *Reuther v. Fowler & Williams, Inc.,* 255 Pa.Super. 28, 31, 386 A.2d 119, 120 (1978). The *Reuther* court held that "the law of this Commonwealth recognizes a cause of action for damages resulting when an employee is discharged for having performed his obligation of jury service." 255 Pa.Super. at 32, 386 A.2d at 120. Similarly in *Yaindl v. Ingersoll-Rand Co.,* 281 Pa.Super. 560, 572, 422 A.2d 611, 617 (1980), the Superior Court recognized "an interest of the public in seeing to it that the employer does not act abusively." *See also Hunter v. Port Authority of Allegheny County,* 277 Pa.Super. 4, 419 A.2d 631 (1980) (non-statutory wrongful discharge claim of public employee). In addition, other state courts have used public policy standards as the benchmark for wrongful discharge cases; *see, e.g., Jackson v. Minidoka Irrigation District,* 98 Idaho 330, 563 P.2d 54, 57 (1977) ("an employee may claim damages for wrongful discharge when the motivation for the firing contravenes public policy"); *Sventko v. Kroger Co.,* 69 Mich.App. 644, 245 N.W.2d 151 (1976) (discharge in retaliation for filing

workers' compensation claim violates public policy); Comment, *Protecting Employees at Will Against Wrongful Discharge: The Public Policy Exception,* 96 Harv.L.Rev. 1931, 1932 (1983).

Thus, on the issue whether such a suit may go forward, it was incorrect as a matter of law to declare that "no cause of action for wrongful discharge is stated under Pennsylvania law ...." *Novosel v. Nationwide Insurance Co.,* No. 82–1600, slip op. at 1 (W.D.Pa. Jan. 14, 1983). The district court's assertion that "there occurs an express or implied waiver or relinquishment of otherwise valid constitutional rights when an employee voluntarily engages in employment ..." must consequently be rejected as a ruling that "simply persists from blind imitation of the past." Holmes, *The Path of the Law,* 10 Harv.L.Rev. 457, 469 (1897).

### B

Applying the logic of *Geary,* we find that Pennsylvania law permits a cause of action for wrongful discharge where the employment termination abridges a significant and recognized public policy. The district court did not consider the question whether an averment of discharge for refusing to support the employer's lobbying efforts is sufficiently violative of such public policy as to state a cause of action. Nationwide, however, now proposes that "the only prohibition on the termination of an employee is that the termination cannot violate a *statutorily* recognized public policy," Brief of Appellee at 5 (emphasis added)

This Court has recognized that the "only Pennsylvania cases applying public policy exceptions have done so where no statutory remedies were available." *Bruffett, supra,* 692 F.2d at 919. Moreover, both *Reuther* and *Hunter* allowed causes of action to be implied directly from the Pennsylvania Constitution. *Hunter* further noted that Pennsylvania courts allow direct causes of action under the Constitution regardless of legislative action or inaction. 277 Pa.Super. at 14 n. 6, 419 A.2d at 636 n.

6, *citing Erdman v. Mitchell,* 207 Pa. 79, 56 A. 327 (1903). Given that there are no statutory remedies available in the present case and taking into consideration the importance of the political and associational freedoms of the federal and state Constitutions, the absence of a statutory declaration of public policy would appear to be no bar to the existence of a cause of action. Accordingly, a cognizable expression of public policy may be derived in this case from either the First Amendment of the United States Constitution or Article I, Section 7 of the Pennsylvania Constitution.[6]

The key question in considering the tort claim is therefore whether a discharge for disagreement with the employer's legislative agenda or a refusal to lobby the state legislature on the employer's behalf sufficiently implicate a recognized facet of public policy. The definition of a "clearly mandated public policy" as one that "strikes at the heart of a citizen's social right, duties and responsibilities," set forth in *Palmateer v. International Harvester Co.,* 85 Ill.2d 124, 52 Ill.Dec. 13, 421 N.E.2d 876 (1981), appears to provide a workable standard for the tort action. While no Pennsylvania law directly addresses the public policy question at bar, the protection of an employee's freedom of political expression would appear to involve no less compelling a societal interest than the fulfillment of jury service or the filing of a workers' compensation claim.

An extensive case law has developed concerning the protection of constitutional rights, particularly First Amendment rights, of government employees. As the Supreme Court has commented, "[f]or most of this century, the unchallenged dogma was that a public employee had no right to object to conditions placed upon the terms of employment—including those which re-

stricted the exercise of constitutional rights." *Connick v. Myers,* —— U.S. ——, 103 S.Ct. 1684, 1688, 75 L.Ed.2d 708 (1983). The Court in *Connick,* however, also observed the constitutional repudiation of this dogma: "[f]or at least 15 years, it has been settled that a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Id.* at 1687, *citing Branti v. Finkel,* 445 U.S. 507, 515–516, 100 S.Ct. 1287, 1293–1294, 63 L.Ed.2d 574 (1980); *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972); *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Keyishian v. Board of Regents,* 385 U.S. 589, 605–606, 87 S.Ct. 675, 684–685, 17 L.Ed.2d 629 (1967). "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Board of Education v. Barnette,* 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943). Thus, there can no longer be any doubt that speech on public issues "has always rested on the highest rung of the hierarchy of First Amendment values." *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 102 S.Ct. 3409, 3426, 73 L.Ed.2d 1215 (1982), *quoting Carey v. Brown,* 447 U.S. 455, 467, 100 S.Ct. 2286, 2293, 65 L.Ed.2d 263 (1980).[7]

In striking down the use of patronage appointments for federal government employees, the Court further noted that one of its goals was to insure that "employees themselves are to be sufficiently free from improper influences." *CSC v. Letter Carriers,* 413 U.S. 548, 564, 93 S.Ct. 2880, 2890, 37

---

**6.** The relevant portion of Article I, Section 7 of the Pennsylvania Constitution states:

> The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty.

**7.** Nor can there be any doubt that the right to petition or not petition the legislature is incorporated within protected speech on public is-

sues. Thus, for example, in limiting the scope of the Sherman Act, the Supreme Court declared, "[t]he right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms." *Eastern RR Presidents' Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 138, 81 S.Ct. 523, 530, 5 L.Ed.2d 464 (1961).

L.Ed.2d 796 (1973). It was not, however, simply the abuse of state authority over public employees that fueled the Court's concern over patronage political appointments; no less central is the fear that the political process would be irremediably distorted. If employers such as federal, state or municipal governments are allowed coercive control of the scope and direction of employee political activities, it is argued, their influence will be geometrically enhanced at the expense of both the individual rights of the employees and the ability of the lone political actor to be effectively heard.[8]

We further note that the Pennsylvania Supreme Court has similarly voiced its concern over the threat posed by discharges to the constitutionally protected rights of employees. In *Sacks v. Commonwealth of Pennsylvania, Department of Public Welfare,* 502 Pa. 201, 465 A.2d 981 (Pa.Sup. Ct.1983), the court ordered a state employee reinstated following a discharge for public comments critical of his agency employer. The court reasoned,

> there is a calculus of injury required in First Amendment government employee cases in which as the First Amendment interest in the speech rises, so does the government's obligation to react with caution, disciplining an employee, if at all, only when injury to the agency is more than speculative.

*Id.,* 502 Pa. at 215, 465 A.2d at 988.

■ Although Novosel is not a government employee; the public employee cases do not confine themselves to the narrow question of state action. Rather, these cases suggest that an important public policy is in fact implicated wherever the power to hire and fire is utilized to dictate the terms of employee political activities. In dealing with public employees, the cause of action arises directly from the Constitution rather than from common law developments. The protection of important political freedoms, however, goes well beyond the question whether the threat comes from state or private bodies. The inquiry before us is whether the concern for the rights of political expression and association which animated the public employee cases is sufficient to state a public policy under Pennsylvania law. While there are no Pennsylvania cases squarely on this point, we believe that the clear direction of the opinions promulgated by the state's courts suggests that this question be answered in the affirmative.

■ Having concluded thereby that an important public policy is at stake, we now hold that Novosel's allegations state a claim within the ambit of *Geary* in that Novosel's complaint discloses no plausible and legitimate reason for terminating his employment, and his discharge violates a clear mandate of public policy. *See Geary,* 456 Pa. at 184–85, 319 A.2d at 180. The Pennsylvania Supreme Court's rulings in *Geary* and *Sacks* are thus interpreted to extend to a non-constitutional claim where a corporation conditions employment upon political subordination. This is not the first judicial recognition of the relationship between economic power and the political process:

> the special status of corporations has placed them in a position to control vast amounts of economic power which may, if

---

**8.** In its leading statement on the effects the power of employers may have on the political process, the Supreme Court stated:

Conditioning public employment on partisan support prevents support of competing political interests. Existing employees are deterred from such support, as well as the multitude seeking jobs. As government employment, state or federal, becomes more pervasive, the greater the dependence on it becomes, and therefore the greater becomes the power to starve political opposition by commanding partisan support, financial and oth-

erwise. Patronage thus tips the electoral process in favor of the incumbent party, and *where the practice's scope is substantial relative to the size of the electorate, the impact on the process can be significant.*

Our concern with the impact of patronage on *political belief and association* does not occur in the abstract, *for political belief and association constitute the core of those activities protected by the First Amendment.*

*Elrod v. Burns,* 427 U.S. 347, 356, 96 S.Ct. 2673, 2681, 49 L.Ed.2d 547 (1976) (emphasis added).

not regulated, dominate not only the economy but also the very heart of our democracy, the electoral process.... [The desired end] is not one of equalizing the resources of opposing candidates or opposing positions, but rather of preventing institutions which have been permitted to amass wealth as a result of special advantages extended by the State for certain economic purposes from using that wealth to acquire an unfair advantage in the political process....

*First National Bank of Boston v. Bellotti,* 435 U.S. 765, 809, 98 S.Ct. 1407, 1433, 55 L.Ed.2d 707 (1978) (White, J., dissenting).[9]

## C

■ Because this case is to be remanded, and taking into consideration the relative novelty of wrongful discharge actions, we proceed to a consideration of the factual bases a plaintiff would have to establish in order to prevail. It appears that the same factors to which the Pennsylvania Supreme Court referred in *Sacks* for evaluating the evidentiary sufficiency of Sacks' claim would be just as applicable to the case at hand. Thus, on remand the district court should employ the four part inquiry the *Sacks* court derived from *Connick* and *Pickering:*

1. Whether, because of the speech, the employer is prevented from efficiently carrying out its responsibilities;

2. Whether the speech impairs the employee's ability to carry out his own responsibilities;

3. Whether the speech interferes with essential and close working relationships;

4. Whether the manner, time and place in which the speech occurs interferes with business operations.

*Sacks, supra,* 502 Pa. at 216, 465 A.2d at 988.

■ In weighing these issues, a court should employ the balancing test factors set forth for wrongful discharge cases by the Pennsylvania Superior Court in *Yaindl, supra:*

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference, and

(g) the relations between the parties.

281 Pa.Super. at 574, 422 A.2d at 618, *quoting* Restatement (Second) of Torts § 767 (1979).

**9.** The district court relies heavily upon the majority opinion in *Bellotti* to support the proposition that so long as an employer's actions were "in furtherance of its normal and ordinary business interests," *Novosel v. Nationwide Insurance Co.,* No. 82–1600, slip op. at 1 (W.D.Pa. Jan. 14, 1983), its political activities are beyond court scrutiny. By extending constitutional protection to corporate political activity, the district court precludes any common law tort claim. In our view, this reliance on *Bellotti* obscures the fact that there are two distinct issues present here: 1) whether a corporation may engage in the type of lobbying demonstrated by defendant; and 2) whether the economic power of such corporations (in this case the power to discharge) may be utilized to coerce individual employee assistance to the corporate political agenda. Although *Bellotti* does find that corporate speech is entitled to First Amendment protection, the opinion does not stand for the proposition that corporations in the political arena can neither do any wrong nor be regulated. *See, e.g., Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); Federal Corrupt Practices Act, 2 U.S.C. § 441(b) (1976). *See also* Note, Constitutional Rights of the Corporate Person, 91 Yale L.J. 1641, 1651 (1982):

> The notion that soulless, inarticulate corporations could even hold a political view, let alone insist on the right to express it, would be incomprehensible to the scholastic philosophers and the classical economists who provided the conceptual ground for earlier explanations of corporate personality.

At the very least, it does not follow from *Bellotti* that the right of political expression of a corporation enjoys a transcendent constitutional position regardless of other societal or constitutional interests.

IV

Employment-at-will has long been a major tenet of American contract law.[10] Numerous proposals for statutory protection from arbitrary discharge have come from commentators [11] concerned by the absence of job security for over 60 per cent of the American workforce.[12] Legislative proposals extending a "just cause" discharge requirement to all employees regardless of coverage or lack of it under the National Labor Relations Act have been considered in Pennsylvania as well as Colorado, Connecticut, Michigan, New Jersey and Wisconsin.[13]

Novosel concedes that there is no statutory basis at present in Pennsylvania for a just cause requirement for discharges and, in fact, "the case law favoring someone like plaintiff under a breach of contract theory has been sparse." Brief of Appellant at 21. Instead, we are urged to fashion a common law just cause standard premised primarily on the critical treatment of at-will discharges by the commentaries.[14] Whatever the merits of such a standard, it

is not the role of a federal court sitting in diversity to create its own common law.[15]

The absence of a uniform just cause requirement for discharge, however, does not conclude the contractual issue presented here. As with the wrongful discharge tort doctrine, the contractual claims of non-union employees have been the subject of rapidly evolving judicial developments. In *Toussaint v. Blue Cross & Blue Shield of Michigan,* 408 Mich. 579, 614–15, 292 N.W.2d 880, 892 (1980), the Michigan Supreme Court held that oral representations of job security by the employer and the written procedures in the employee policy manual gave rise to enforceable contract claims in a discharge action. Similarly, in *Pugh v. See's Candies, Inc.,* 116 Cal.App.3d 311, 325–26, 171 Cal.Rptr. 917, 925 (1981), an employee's promise of faithful service to the employer was found to be sufficient to constitute consideration for a reciprocal duty on the employer's part to refrain from arbitrary dismissal.[16]

Thus, Novosel's allegation that Nationwide's custom, practice or policy created

---

**10.** The employment-at-will rule has been recognized in the major treatises. *See* 9 WILLISTON ON CONTRACTS § 1017 (3d ed. 1967); 3A CORBIN ON CONTRACTS § 684 (1960 & Supp.1971). *See also* Comment, Employment At Will and the Law of Contracts, 23 Buff.L. Rev. 211, 212–16 (1973).

**11.** *See, e.g.,* Mennemeier, Protection from Unjust Discharges: An Arbitration Scheme, 19 Harv.J. on Legis. 49 (1982); Platt, Rethinking the Right of Employers to Terminate At-Will Employees, 15 J.Mar.L.Rev. 633 (1982); St. Antoine, You're Fired!, 10 Hum.Rts. 32 (1982); Peck, Some Kind of Hearing for Persons Discharged from Private Employment, 16 San Diego L.Rev. 313 (1979); Summers, Individual Protection Against Unjust Dismissal: Time for a Statute, 62 Va.L.Rev. 481 (1976).

**12.** Note, Reforming At-Will Employment, *supra* note 4, at 389.

**13.** *Id.* at 404 n. 82; Note, "Just Cause" Termination Rights for At-Will Employees, 1982 Det.C. of L.Rev. 591, 615 (1982).

**14.** *See, e.g.,* Note, "Just Cause" Termination, *supra* note 12; Comment, Protecting At-Will Employees Against Wrongful Discharge: The Duty to Terminate Only in Good Faith, 93 Harv.L.Rev. 1816 (1980).

**15.** We are reminded that the history of federal courts dictating the terms of employment relations contracts has not been altogether felicitous for employee rights. *See Adair v. U.S.,* 208 U.S. 161, 28 S.Ct. 277, 52 L.Ed. 436 (1908) (striking down prohibition of yellow dog contract); *Lochner v. New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905) (striking down 10 hour working day statute as violating freedom of contract).

**16.** Several commentators have encouraged the extension of traditional contract doctrines to protect the at-will employee from discharge. The seminal argument is found in Note, Implied Contract Rights to Job Security, 26 Stan.L.Rev. 335 (1974). *See also* Note, Challenging the Employment At-Will Doctrine Through Modern Contract Theory, 16 J. of Law.Ref. 449 (1983) (arguing reliance interests, promissory estoppel and other traditional contractual basis for employee protection); Note, Job Security for the At-Will Employee: Contractual Right of Discharge for Cause, 56 Chi.[-]Kent L.Rev. 697, 728 (1981) (completion of work according to employer's standards earns employee contractual right not to be discharged without cause); Comment, *supra* note 13, at 1832–33 (implied contractual right not to be discharged absent just cause).

either a contractual just cause requirement or contractual procedures by which defendant failed to abide is a factual matter that should survive a motion to dismiss:

> Even when courts ultimately granted motions for summary judgment they acted only after the plaintiff had been given an opportunity to develop the facts of his case, not on a motion to dismiss.

*O'Neill v. ARA Services, Inc.,* 457 F.Supp. 182, 185 n. 1 (E.D.Pa.1978) (applying Pennsylvania law in a breach of employment contract case). The trial court erred in foreclosing discovery concerning Nationwide's internal discharge procedures. At least one Pennsylvania court has ruled that the unilateral adoption of a grievance, discipline and discharge procedure by an employer may give rise to a legally enforceable reliance interest. *Njoku v. University of Pittsburgh,* No. GD 82–13065 (Ct. of C.P., Allegheny County, Sept. 17, 1982). Consequently, Novosel should have been permitted discovery and the development of this point since "Pennsylvania cases have held that whether the parties formed a complete contract is a question for the jury." *O'Neill, supra,* 457 F.Supp. at 185.

### V

The judgment and order of the district court will be vacated and the case remanded for discovery and further proceedings consistent with this opinion.

### STATEMENT OF JUDGE BECKER SUR THE DENIAL OF THE PETITION FOR REHEARING

Because this is a diversity case, the holding of the panel constitutes a mere prediction of the likely course of Pennsylvania law, one subject to revision by the Pennsylvania Supreme Court or the Pennsylvania General Assembly. While this fact would ordinarily render en banc consideration inappropriate, I nonetheless believe that the panel's decision is sufficiently important and sufficiently questionable to call for re-consideration by the en banc Court. *See* Third Circuit IOP Chapter 8 B. I suspect that this assessment will be joined in by many of the district courts in this circuit, which are bound by the panel's prediction and whose dockets may well be inundated by wrongful discharge claims asserting termination for failure to undertake a job action colorably characterizable as political.

My concern is that the panel has announced an extremely broad "public policy" exception to the law of at-will employment in Pennsylvania that threatens to engulf or "overrule" the holding of the Pennsylvania Supreme Court in *Geary v. U.S. Steel Corp.,* 456 Pa. 171, 319 A.2d 174 (1974)—an action Pennsylvania itself has apparently shown no inclination to undertake. *Cf. Richardson v. Charles Cole Memorial Hospital,* —— Pa. Super. ——, 466 A.2d 1084 (1983). More specifically, I have three major problems with the panel opinion.

First, the opinion ignores the state action requirement of first amendment jurisprudence, particularly by its repeated, and, in my view, inappropriate citation of public employee cases, and by its implicit assumption that a public policy against government interference with free speech may be readily extended to private actors in voluntary association with another, *see, e.g., Hudgens v. NLRB,* 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976). Second, the opinion could be read to suggest that an explicit contractual provision authorizing an employer to dismiss a lobbyist for failure to undertake lobbying might be unenforceable or subject to a balancing test. Third, the opinion fails to consider other public policy interests, such as the economic interests of the public in efficient corporate performance, the first amendment interests of corporations, *see First National Bank of Boston v. Bellotti,* 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), and the legitimate interests of a corporation in commanding the loyalty of its employees to pursue its economic well being.[*]

---

* I recognize that all of these problems may be partly remedied by the balancing test announced on page 901 of the slip opinion; however, I fear that application of that test nonetheless attenuates the employers' and the public's interests.

I therefore dissent from the denial of rehearing.