**Linda KILPATRICK**

v.

**DELAWARE COUNTY SOCIETY FOR the PREVENTION OF CRUELTY TO ANIMALS (S.P.C.A.).**

Civ. A. No. 84–0760.

United States District Court, E.D. Pennsylvania.

April 8, 1986.

Dennis J. Muir, Philadelphia, Pa., for plaintiff.

Leo A. Hackett, Media, Pa., for defendant.

## OPINION

JOSEPH S. LORD, III, Senior District Judge.

Linda Kilpatrick was terminated from her position as a kennel worker by the Delaware County Society for the Prevention of Cruelty to Animals ("S.P.C.A."). Her complaint alleged that she was fired because she reported an occupational health hazard to the Pennsylvania Department of Agriculture. Count I of her complaint alleged that the termination violated her first amendment rights. Count II alleged the common law tort of wrongful discharge. Count III alleged that particular aspects of her termination amounted to the intentional infliction of emotional distress. At trial, defendant's motion for a directed verdict was granted as to Counts I and III. The jury returned a verdict in plaintiff's favor as to Count II and found that the plaintiff had incurred damages of $15,931.29; $10,931.29 in lost wages and benefits and $5,000.00 for the emotional distress plaintiff suffered due to the termination.

The defendant has moved for judgment notwithstanding the verdict contending that (1) since Count II incorporated the factual allegations of Count I, all of which were not proven at trial, Count II should have been dismissed along with Count I; (2) plaintiff's termination did not violate a clearly established public policy and therefore does not support a claim for wrongful discharge; (3) Count II of plaintiff's complaint is preempted by the Occupational Safety and Health Act ("OSHA"), 29 U.S.C. § 651 *et seq.* (1984), and; (4) there was insufficient evidence to justify submitting to the jury the issue of emotional distress arising out of the termination. For the reasons that follow defendant's motion will be denied.

## I. *The facts*

A brief synopsis of the evidence presented at trial is necessary before considering defendant's legal arguments. In considering a motion for judgment notwithstanding the verdict, I must view the evidence in the light most favorable to the party who secured the verdict. *Fireman's Fund Ins. Co. v. Videfreeze Corp.*, 540 F.2d 1171, 1178 (3d Cir.1976), *cert. denied*, 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977).

Plaintiff is an unmarried mother, the sole supporter of herself and her child. One of her tasks at the S.P.C.A. was cleaning kennels. Terry Dotts, her immediate supervisor, gave her a new product, "T.B.Q.," and told her to mix a few drops of it with some bleach and water and spray down the kennels with the mixture. She was not provided with precise instructions about how to mix the solution, nor was she provided with gloves, goggles or protective clothing.

Within one week of using T.B.Q. plaintiff developed a red rash on her hands, arms and face. Her skin became dry and itchy and began to seep. Plaintiff testified that one coworker developed the rash and another had trouble breathing after working with T.B.Q. Ann Porter, an S.P.C.A. employee, testified that one employee passed out and another became ill after using T.B.Q.

Plaintiff complained to Terry Dotts. At first she received no response, then he claimed her problems were not being caused by T.B.Q. During a nine day vacation her hands began to heal, but they grew worse after she returned to work and exposure to T.B.Q. She decided to examine the label on the barrel of T.B.Q., but because it was facing the wall, needed the help of another employee to turn the barrel around. The label frightened her because

it said that T.B.Q. was corrosive to tissues and could harm her eyes and skin.

Plaintiff went to see her physician and brought along a copy of T.B.Q.'s ingredients. Her physician stated that her problems very likely were caused by T.B.Q. She reported this to Terry Dotts who again denied that T.B.Q. was responsible for her condition. Plaintiff asked for more information about T.B.Q., so he told her to look for a pamphlet about the product in his office. The pamphlet instructed users to wear goggles and gloves and to keep the product off their skin and clothing. After reading the pamphlet she complained again to Terry Dotts who ignored her.

Plaintiff then explained her problems to Ms. Ottey, another of her superiors at the S.P.C.A. Later in the day Ms. Ottey reported that she had spoken with Ms. Meade, the S.P.C.A.'s president, who said there was nothing wrong with T.B.Q. and that they would continue using it. Terry Dotts then began to watch plaintiff in order to be certain that she was cleaning with T.B.Q. instead of pouring it down the drain as other employees were doing. Plaintiff then complained directly to Ms. Meade who told plaintiff that her problem was being caused by something in her home and not by T.B.Q. or anything in the kennel.

Finally, plaintiff reported her problem to the Pennsylvania Department of Agriculture. The Department sent an inspector who concluded that the handling, dilution and use of T.B.Q. at the S.P.C.A. was contrary to the manufacturer's instructions and therefore a violation of the Pennsylvania Pesticide Control Act. 3 Pa.S.A. § 111.21 et seq. (1985). Specifically the Department objected to the fact (1) that gloves and goggles were not provided to employees, (2) that an odor control agent and bleach were added to the T.B.Q. and, (3) that insufficient amounts of water were used to dilute the T.B.Q.

Two days after the inspection plaintiff was fired. When asked for a reason Ms. Meade told her that an employer did not need a reason to fire an employee. After being terminated plaintiff became frustrated, angry and depressed. Her physician testified that she deteriorated emotionally due to a pathologic depressive reaction. Physically she felt nauseous, would sometimes cry uncontrollably and had a great deal of trouble sleeping. She became very concerned about her poor financial condition, her lack of employment and her inability to support her child or function as a mother. After beginning to drink too heavily she went to her physician who prescribed Librium and Xanax for her depression. She also went to see a psychiatrist who prescribed Sinequan for her depression.

The jury found that plaintiff was fired because of her complaint to the Department of Agriculture and found that the defendant would not have fired her absent that complaint. The jury also found that some of her emotional problems were caused by the termination.

## II. Plaintiff's failure to prove all of Count II's averments

Defendant has advanced the novel theory that a cause of action must be dismissed simply because it contains irrelevant factual allegations that a plaintiff fails to prove at trial. In Count I of plaintiff's complaint she alleged that all of the defendant's complained of actions were done under color of the laws of the Commonwealth of Pennsylvania. That allegation was incorporated into the complaint's other counts, including Count II, plaintiff's claim of wrongful termination. At the close of plaintiff's case I dismissed Count I, explicitly holding as a matter of law that defendant was a private party and had not acted under color of state law. Defendant argues that Count II should have been dismissed along with Count I, since it contained the same factual allegation concerning state action which plaintiff failed to prove at trial. Count II, however, alleged a violation of the common law of Pennsylvania and it is therefore immaterial whether defendant acted as a private party or under color of state law when it committed the acts complained of in Count II. It, therefore, would have been absurd and unjust to dismiss Count II sim-

ply because plaintiff failed to prove a fact alleged in that Count which was immaterial to her claim.

Fed.R.Civ.P. 12(f) gives me the power upon my "own initiative at any time" to remove this immaterial allegation from Count II of plaintiff's complaint. Since defendant is not prejudiced by this allegation remaining in the complaint, there is no reason to exercise the power granted by Fed.R.Civ.P. 12(f).

### III. *The public policy implications of plaintiff's discharge*

It is now beyond cavil that Pennsylvania law recognizes a cause of action for wrongful discharge when the termination abridges a significant and recognized public policy. *See, e.g., Novosel v. Nationwide Ins. Co.,* 721 F.2d 894 (3d Cir.1983). In Pennsylvania, public policies upon which causes of action for wrongful termination may be based have their source in federal as well as in Commonwealth law. *See, e.g., id.* at 899 (public policy derived from the first amendment of the U.S. Constitution); *Klages v. Sperry Corp.,* 118 L.R.R.M. 2463, 2468 (E.D.Pa.1984) (public policy derived from federal securities laws); *McNulty v. Borden, Inc.,* 474 F.Supp. 1111, 1119 (E.D.Pa.1979) (public policy derived from the Robinson-Patman Act).

In the Occupational Safety and Health Act, 29 U.S.C. § 651 *et seq.* (1984), Congress declared the public policy of assuring so far as possible safe and healthful working conditions for every employee in the nation. 29 U.S.C. § 651(b). Congress explicitly encouraged employees to take an active role in reducing occupational hazards and provided employees with a number of rights which would allow them to meet their responsibilities "with respect to achieving safe and healthful working conditions." 29 U.S.C. § 651(b)(1) and (2). Paramount among these rights is the protection afforded employees by 29 U.S.C. § 660(c)(1), which prohibits employers from terminating or in any manner discriminating against "any employee because such employee has filed any complaint or insti-

tuted or caused to be instituted any proceeding under or related to [OSHA]."

In evaluating a wrongful termination claim, Pennsylvania courts weigh several factors, balancing the employee's interest in making a living, the employer's interest in running its business, its motive in terminating the employee, its manner of effecting the termination and any social interests or public policies that may be implicated in the discharge. *Yaindl v. Ingersoll-Rand Co.,* 281 Pa.Super. 560, 577, 422 A.2d 611, 620 (1980).

Plaintiff's interest in making a living was obviously great, but no greater than most other employees who depend upon their salary for purchasing the necessities of life. Her employer's interest in running its business was equal to the interest any employer has in managing its enterprise. The manner in which plaintiff was fired was certainly callous, but no different from the treatment afforded countless employees. No explanation was provided for the termination even when requested and nothing was done to cushion the financial consequences for plaintiff. Employers, however, have no obligation to explain employment decisions to at-will employees, nor are they required to ameliorate the financial consequences of termination.

The key factors in this suit, therefore, are defendant's motive in firing plaintiff and the social interests or public policies implicated in the termination. The jury found that defendant's motive in firing plaintiff was to retaliate for her complaints to the Pennsylvania Department of Agriculture concerning occupational hazards, complaints which resulted in an inspection by the Department of Agriculture, a finding that defendant's use of a chemical cleaner was "considered in violation of the Pennsylvania Pesticide Control Act," and a warning that further violations by defendant "could result in regulatory action [being] taken [against defendant] under authority of the Act.".

The social interests and public policies at issue in this type of retaliatory discharge are of great importance. America's work-

places are filled with numerous toxic and carcinogenic chemicals which if used unsafely jeopardize the health and well-being of employees, their families and their unborn offspring. Ensuring the proper use of these hazardous chemicals is an important public policy. Not only does it protect workers and their families, but it protects all of us from the effects of pollution which results when hazardous chemicals are handled unsafely in the workplace.

The United States Congress has recognized, as any rational person must, that America's workplaces will not be made safe unless workers are encouraged to take an active role in monitoring the health and safety implications of the conditions in which they are told to work. Few employees would have the courage to report a suspected occupational hazard to an appropriate government agency if they knew they could be fired for taking legitimate measures to protect themselves and their co-workers. Clearly, Pennsylvania officials would be frustrated in their effort to monitor the health and safety conditions of workplaces in the Commonwealth if employers were free to fire employees who complained about occupational hazards to Pennsylvania agencies.

■ I therefore find that OSHA announces a clear and significant public policy sufficient under Pennsylvania law to give rise to a cause of action for wrongful termination if an employee is fired for complaining about occupational hazards to a Commonwealth agency.[1] *Accord Wheeler et al. v. Caterpillar Tractor Co.,* 108 Ill.2d 502, 92 Ill.Dec. 561, 485 N.E.2d 372 (1985); *Cloutier v. Great Atlantic & Pac. Tea Co.,* 121 N.H. 915, 436 A.2d 1140 (1981); *Hentzel v. Singer Co.,* 138 Cal.App.3d 290, 188 Cal.Rptr. 159 (App.1982). *But cf. Walsh v. Consol. Freightways, Inc.,* 278 Or. 347, 563 P.2d 1205 (1977); *Corbin v. Sinclair Marketing, Inc.,* 684 P.2d 265 (Colo.App.1984). I express no opinion as to whether Pennsyl-

vania law would also recognize a cause of action for wrongful discharge if an employee was fired for complaining to his employer or to a federal, rather than a state agency, concerning occupational hazards.

Defendant contends that the social interests and public policies at issue in this suit are not of sufficient import to support a cause of action for wrongful termination, and points to *Geary v. United States Steel Corp.,* 456 Pa. 171, 319 A.2d 174 (1974) as support for its position. In *Geary* the Pennsylvania Supreme Court affirmed the dismissal of a suit by a salesman who alleged that he was fired because of his complaints that one of his employer's products had been inadequately tested and constituted a serious danger to any one who used it. Geary also alleged that as a result of his efforts the product was reevaluated and withdrawn from the market.

*Geary,* however, is readily distinguishable from this lawsuit. In *Geary,* the court had two reasons for rejecting the salesman's claims despite "[t]he praiseworthiness of Geary's motives." 456 Pa. at 183, 319 A.2d at 180. According to the court, "Geary had made a nuisance of himself, and the company discharged him to preserve administrative order in its own house." *Id.* at 180, 319 A.2d at 178. Instead of following the company's chain of command, Geary "by-passed his immediate superiors and pressed his views on higher officers, utilizing his close contacts with a company vice president." *Id.* at 183, 319 A.2d at 179. The "company's legitimate interest in preserving its normal operational procedures from disruption" justified its decision to terminate Geary. *Id.,* 319 A.2d at 180.

The court also emphasized that Geary was merely a salesman. He lacked any relevant expert qualifications and his job responsibilities did not extend to making judgments concerning product safety. If

---

1. The Pennsylvania Pesticide Control Act also sets forth significant public policies which support plaintiff's cause of action for wrongful discharge. "[I]t is essential to the public health and welfare that [pesticides] be regulated to

prevent adverse effects on human life and the environment. The purpose of this act is to regulate in the public interest, the ... use, application, and disposal of pesticides." 3 Pa.S.A. § 111.23 (1985).

Geary's job responsibilities had included the exercise of independent, expert judgment in matters of product safety, the court suggested that it would have protected him from a retaliatory termination. 456 Pa. at 181, 319 A.2d at 178–79. Geary, however, was stepping outside the bounds of his well defined job responsibilities, asserting "that his business judgment [was] superior to that of the company officials who [were] hired and compensated handsomely for the exercise of their entrepreneurial skill and ability." *Callahan v. Scott Paper Co.*, 541 F.Supp. 550, 563 (E.D. Pa.1982). Good intentions alone are insufficient to protect an employee in Pennsylvania when he pokes his nose into management decisions which are none of his concern.

Unlike Geary, plaintiff did not go outside of her employer's chain of command when making her complaints. Plaintiff first complained to her immediate supervisor and then brought her concerns step by step up through defendant's management hierarchy. Plaintiff did not disrupt defendant's normal operational procedures by using "close contacts" to press her complaints on upper level management. No evidence was presented which even remotely suggests that plaintiff was fired for raising questions about T.B.Q. with management employees other than her immediate supervisor.

Unlike Geary, plaintiff was not complaining about business judgments made by her employer which were none of her concern. She was not accusing her employer of immoral business practices nor was she criticizing her superiors for making poor business judgments which she believed unnecessarily exposed the defendant to potential legal liability. It was she and her fellow employees that were being improperly exposed to T.B.Q. and suffering the deleterious effects of that exposure. Her complaints were motivated by fears and concerns about the health and well being of herself and her fellow employees.

Clearly, plaintiff was not an expert in matters of occupational health and safety.

Nor had defendant assigned her the task of monitoring the health implications of its operations. Employers, however, do not alone decide the full scope of employee job responsibilities. It is the announced policy of Congress that employees as well as employers are responsible for insuring safe and healthy working conditions for all American workers. Occupational health and safety are legitimate concerns for all employees, not simply for those employees hired and compensated to exercise their expertise in the field of occupational safety and health.

### IV. *Defendant's preemption arguments*

█ Although not clearly explicated, defendant has made two distinct preemption arguments. First, defendant has put forward the run of the mill preemption argument, claiming that by passing OSHA Congress intended to occupy the entire field of occupational health and safety law. According to defendant, courts lack jurisdiction over causes of action by employees alleging retaliation due to complaints about occupational hazards, unless those lawsuits are brought by the Secretary of Labor pursuant to OSHA. Second, defendant argues that the existence of a remedy for plaintiff in this case pursuant to OSHA would be viewed by the Pennsylvania Supreme Court as a sufficient reason not to recognize a common law cause of action for wrongful discharge. According to defendant, even if Congress did not intend to preempt Pennsylvania law, Pennsylvania courts would view the existence of a federal statutory remedy as a sufficient reason to preempt voluntarily Pennsylvania common law and the policies those laws are meant to further. For the reasons that follow I reject both of defendant's preemption arguments.

### A. *Defendant's federal based preemption argument*

Defendant's position that by passing OSHA Congress intended to preempt common law causes of action similar to plaintiff's is undercut by OSHA's express terms. Defendant is correct in observing that lawsuits based upon violations of

OSHA's anti-discrimination provision may only be brought by the Secretary of Labor. *See* 29 U.S.C. § 660(c)(2). Employees have no private right of action under OSHA. *See, e.g., Taylor v. Brighton Corp.*, 616 F.2d 256 (6th Cir.1980). Plaintiff, however, does not seek to remedy a violation of OSHA. Rather, she seeks redress for her unlawful termination, a violation of Pennsylvania common law, a common law which I have held seeks to further policies similar to those announced by Congress when it enacted OSHA.

Nothing in OSHA preempts this type of common law cause of action. Congress explicitly decided that OSHA would not preempt the entire field of occupational health and safety law. *Puffer's Hardware, Inc. v. Donovan*, 742 F.2d 12, 16 (1st Cir.1984). Nothing in OSHA prevents courts "from asserting jurisdiction under [Pennsylvania] law over any occupational safety or health issue with respect to which no [federal] standard is in effect [pursuant to] section 655 of this title." 29 U.S.C. § 667(a). Clearly, it would be absurd for Congress to permit states to assert jurisdiction over occupational safety and health issues while prohibiting states from protecting employees who aid in the enforcement of state law by reporting suspected occupational hazards to state agencies. The same policy considerations which led Congress to protect employees who aid in the enforcement of OSHA are equally applicable to state mechanisms for enforcing state occupational safety and health laws. Since no federal standards have been enacted to regulate the use of T.B.Q., nothing in OSHA prevents me from asserting jurisdiction over plaintiff's common law cause of action.

### B. *Defendant's state based preemption argument*

Even if OSHA by its own terms does not preempt plaintiff's cause of action, defendant suggests that Pennsylvania courts would not recognize plaintiff's common law cause of action because of the availability of a remedy for plaintiff under OSHA.

This argument, however, is premised upon the inaccurate assumption that OSHA provides a remedy for employees who are fired for complaining about occupational hazards to Pennsylvania agencies. The jury found that plaintiff was discharged because she complained to the Pennsylvania Department of Agriculture. It did not find that plaintiff was terminated for complaining to her employer or to the federal Occupational Safety and Health Administration. Defendant's argument that the Pennsylvania Supreme Court would refuse to recognize a common law action in this case because plaintiff could have used OSHA to right the wrong committed against her, must necessarily be rejected because OSHA does not protect employees who complain about violations of Pennsylvania law to Pennsylvania administrative agencies.

Nothing in OSHA, its legislative history or in the relevant case law has been cited by defendant in support of its theory that with the passage of OSHA, the federal government entered into the business of protecting Pennsylvania workers who aid in the enforcement of Pennsylvania law. OSHA protects employees who file complaints or institute proceedings "under or related" to OSHA. Plaintiff's complaint to the Pennsylvania Department of Agriculture was made under the laws of Pennsylvania. It was unrelated to any provision of OSHA or to any regulations or standard promulgated pursuant to OSHA. The Secretary of Labor is given numerous powers under OSHA, but nowhere is the Secretary granted the power to decide how to further the administrative enforcement mechanisms created by Pennsylvania lawmakers. The Pennsylvania legislature enacted the Pesticide Control Act and charged the Department of Agriculture with its enforcement. Pennsylvania is free either to protect employees who aid in the enforcement of this and other Pennsylvania laws or to leave them at the mercy of their employers. The federal government does not normally take it upon itself to decide whether individuals who complain to non-federal agen-

cies should be protected from retaliation by their employers.

I therefore refuse to find that OSHA protects employees who are fired in retaliation for complaints to Pennsylvania agencies about violations of Pennsylvania law. Although Congress has announced a public policy opposed to adverse discrimination against employees who complain about occupational hazards, OSHA would not have provided plaintiff with a remedy for the specific type of retaliatory discharge complained of in this lawsuit.

Even if I am incorrect and OSHA does empower the Secretary of Labor to protect employees who complain to Pennsylvania officials about occupational hazards, I hold that the Pennsylvania Supreme Court would nevertheless recognize a common law action for wrongful termination in the circumstances of this case.[2]

The Third Circuit has held that Pennsylvania courts will not recognize a common law cause of action for wrongful discharge if the Pennsylvania Human Relations Act ("PHRA") proscribes the complained of behavior and provides the employee with a statutorily based cause of action. *See, e.g., Wolk v. Saks Fifth Ave., Inc.,* 728 F.2d 221 (3d Cir.1984); *Bruffett v. Warner Communications, Inc.,* 692 F.2d 910 (3d Cir.1982). Allowing a common law cause of action to remedy a wrong which could be righted pursuant to the PHRA would permit an employee to circumvent the carefully drafted administrative procedures adopted by the Pennsylvania legislature. 728 F.2d at 224; 692 F.2d at 919.

These court of appeals cases, however, do not control the lawsuit presently before me. Neither the PHRA nor any other Pennsylvania statute prevents employers from adversely discriminating against an employee who complains about occupational health hazards. Moreover, neither the Third Circuit nor the Pennsylvania Su-

preme Court has explicitly held that the existence of a federal remedy for adverse discrimination by an employer preempts Pennsylvania common law actions for wrongful termination.

The policies and laws at issue in this lawsuit are first and foremost Pennsylvania policies and laws, and there is little reason to think Pennsylvania courts would entrust their enforcement to the Secretary of Labor. The Pesticide Control Act was enacted and the Pennsylvania Department of Agriculture was empowered to monitor compliance with that act, in order to protect individuals living and working in Pennsylvania. If employers are permitted to terminate employees who complain about occupational hazards to Pennsylvania agencies, it is those agencies, not federal officials, which will have a more difficult time enforcing the laws and policies adopted by Pennsylvania.

It matters little that many of the policies at issue in this lawsuit were first announced by Congress when it enacted OSHA. Pennsylvania is free to adopt or reject those policies as part of its common law. If the policies announced by Congress in OSHA are adopted by Pennsylvania courts, then they become as much a part of Pennsylvania law as any other policy promoted by the common law of Pennsylvania. The fact that OSHA gives the Secretary of Labor the discretionary power to promote similar policies would not deter the Pennsylvania Supreme Court from recognizing a cause of action for wrongful termination in this case. OSHA, unlike the PHRA, does not give aggrieved employees a private right of action. Refusing to recognize a common law action in this case would not only mean that Pennsylvania courts were relying upon federal law to enforce policies important to the Commonwealth, but would also mean that they

---

**2.** OSHA apparently does give the Secretary of Labor the authority to pursue remedies on behalf of employees who allege that they were discharged for complaining to their employers about occupational hazards. *See Marshall v. Springville Poultry Farm, Inc.,* 445 F.Supp. 2 (M.D.Pa.1977). If Kilpatrick had filed a complaint with OSHA alleging that she had been terminated for complaining to her employer about T.B.Q., it is possible that the Secretary of Labor would have filed a lawsuit in district court on her behalf.

were relying upon federal officials whose vigor in enforcing OSHA waxes and wanes depending upon the prevailing political winds blowing toward Washington.

Pennsylvania courts have never eliminated a common law cause of action simply because the federal government has enacted legislation promoting policies similar to those furthered by the common law. Combinations in restraint of trade violate Pennsylvania's common law. Yet Congress' decision to promote many of the policies furthered by Pennsylvania's common law concerning combinations in restraint of trade, has not resulted in the common law action being abolished in favor of the federal statutory remedy. Facts which give rise to a federal statutory antitrust action can also support a Pennsylvania common law cause of action. *See, e.g., Beck v. Athens Bldg. Loan and Sav. Ass'n,* 65 F.R.D. 691, 695 (M.D.Pa.1974).

Promoting the policies which underlie the common law of Pennsylvania is of paramount importance to Pennsylvania courts. They are not about to abdicate that responsibility just because Congress has enacted legislation to further similar policies. If an important public policy merits incorporation into Pennsylvania's common law, then the fact that the federal government has enacted legislation promoting similar policies will not be considered a sufficient justification to stifle the development of Pennsylvania's common law.

### V. *Emotional distress*

Finally, defendant claims that even if plaintiff was wrongfully discharged, there was insufficient evidence to send to the jury the question of emotional distress arising out of the wrongful termination.

In *Yaindl* the court held that the factors which should be weighed when evaluating a claim for wrongful termination were identical to the factors considered relevant to a claim of intentional interference with the performance of a contract. "[T]he most useful way to view an action for wrongful discharge is as a particularized instance of [the] more inclusive tort of intentional interference with the performance

of a contract." 281 Pa.Super. at 574–75, 422 A.2d at 618. This approach to wrongful termination suits was endorsed by the Third Circuit in *Novosel.* 721 F.2d at 901.

In determining the appropriate measure of damages in a wrongful termination context, it is therefore appropriate to look at the type of damages recoverable for the intentional interference with the performance of a contract. Since for both torts similar factors are used to evaluate whether similar wrongs were committed, there is no reason why the victims of both torts should not be permitted to recover the same types of damages.

■ In Pennsylvania one who is liable to another for interference with a contract is liable for damages for the emotional distress which is reasonably expected to result from the wrongful interference. *Tose v. First Pennsylvania Bank, N.A.,* 648 F.2d 879, 898 (3d Cir.), *cert. denied,* 454 U.S. 893, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981). The victim of a wrongful termination, therefore, also should be entitled to recover damages for emotional distress reasonably expected to result from the wrongful discharge.

Defendant has not objected to this approach toward damages. Instead, the defendant argues that there was insufficient evidence to allow the issue of emotional distress to go to the jury.

■ Defendant's evidentiary argument is meritless. Both plaintiff and her physician testified extensively concerning plaintiff's deteriorating emotional condition and its causal relationship to her termination. Considering plaintiff's precarious position as a single parent without any source of income other than her job, the jury could have found that her emotional distress about being fired was reasonably expected to result from her wrongful termination. There was sufficient evidence for this question to go to the jury and their verdict was reasonable in light of the evidence presented to them.